IN THE MATTER OF ARBITRATION )
)
)
)
BETWEEN )
)
) GRIEVANCE ID: INCENTIVE RATE
)
TEAMSTERS LOCAL UNION NO. 20 )
)
Union ) BEFORE: ROBERT G. STEIN, NAA
) ARBITRATOR
AND )
)
)
BROWNING-FERRIS INDUSTRIES OF )
OHIO, INC., d/b/a REPUBLIC )
SERVICES OF ELYRIA
)
Employer )
)
)

FOR THE UNION: John R. Doll, Esq.
DOLL, JANSEN & FORD
111 W. First St., Suite 1100
Dayton, OH 45402-1156
jdoll@djflawfirm.com


FOR THE EMPLOYER: Richard A. Millisor, Esq.
FISHER & PHILLIPS LLP
200 Public Square, Suite 4000
Cleveland, OH 44144
rmillisor@fisherphillips.com


EXHIBIT B

## INTRODUCTION

This matter came on for hearing before the arbitrator pursuant to the collective bargaining agreement ("Agreement") (Joint Ex. 1) between Browning-Ferris Industries of Ohio, Inc. d/b/a/ Republic Services of Elyria ("Company" or "Employer") and Teamsters Local Union No. 20 ("Union"). That Agreement is effective from March 1, 2017 through February 28, 2021 and includes the conduct which is the subject of this grievance.

Robert G. Stein was mutually selected by the parties to impartially arbitrate this matter, pursuant to the terms of Article 7, Section 7.03, Step 4 of the Agreement. A hearing on this matter was conducted on October 16 and December 18, 2018 in a conference room at the Radisson Hotel, located at 25070 County Club Boulevard in North Olmstead, Ohio. The parties agreed to those hearing dates and that location, and they were each provided with a full opportunity to present both oral testimony and documentary evidence supporting their respective positions. The hearing, which was fully recorded via a written transcript, was declared closed upon the parties' individual submissions of post-hearing briefs on February 18, 2019.

The parties have stipulated that the matter is properly before the arbitrator for a determination on the merits. (Tr. 8; Union brief p. 1) The parties have also agreed to the submission of three (3) joint exhibits.

2

**ISSUE**

Did the Company violate the Agreement by reducing the piece work rates in Lorain following the transition from manual waste collection to automated waste collection? If so, what is the appropriate remedy?

**RELEVANT AGREEMENT PROVISIONS**

ARTICLE 3—MANAGEMENT RIGHTS
ARTICLE 7—GRIEVANCE PROCEDURE
ARTICLE 9—WAGES

**BACKGROUND**

The Company, with its local offices based in Elyria, Ohio, provides waste collection services for the City of Lorain ("Lorain" or "City"), as well as numerous other communities in the area to the west of Cleveland, Ohio. (Tr. 45-46, 64-65, 355-357) The Company has contracts with approximately twenty-three (23) total cities, townships and villages in that general area, which represents approximately two-thirds of the Company's residential routes. (Tr. 64-66)

The then-existing contract between the Company and the City recognized that the Company would provide both unlimited solid waste and also recycling collection services for the City's identified residents from March 1, 2013 through February 28, 2017. (Joint Ex. 3) Under that existing contract, the Company did not provide Lorain residents with any containers to house the trash and recyclable debris. (Tr. 90, 169-171) As a result, the Company's drivers or operators manually collected each resident's solid, bulk, and yard waste which were placed on the curb near the individual homes or apartments on the regularly-scheduled collection days. (Union Ex. 4, Tr. 191-192, 200, 405-406) Manual

3

collection would sometimes require the Company's drivers or operators to individually lift large items, such as refrigerators or mattresses, onto the Company's trucks. (Tr. 95, 173-174) The collection for recyclable items involved residents placing the recyclable items in blue bags which were also placed near the curb for collection. (Tr. 90) Throughout the duration of the parties' prior contract from 2013-2017, residents' participation in the recycling service was relatively low. (Tr. 59, 90-95)

Significantly to the parties to this dispute, during several weeks in May 2017 Lorain became the first municipality under contract with the Company to convert from manual to automated waste collection. (Tr. 46, 67-68, 145, 386) "Unlike manual collection where the driver gets out of the truck at every stop to physically throw trash into the truck, automated collection allows the driver to remain in the truck while manipulating a joystick to have a mechanical arm dump the waste container into the truck. Automated collection is safer, less physically demanding and more efficient than manual collection." (Employer brief p. 1) It is also quicker than manual operation and allows drivers to collect waste from approximately thirty (30) to forty (40) percent more homes in a day compared to manual operation. (Tr. 58, 80-81, 103, 402-403). "... the average number of homes collected per day in Lorain for trash increased from approximately 661 homes per day using manual collection to approximately 1,113 homes per day using automated collection." (Employer brief p. 9, fn. 8; Union Ex. 4)

To enable that transition from manual to automated operation, the Company invested over $4 million. (Tr. 371-379, 390-395; Employer Ex. 10) Those efforts included the following:

4

- Retrofitting the front-load trucks to perform automated collection by installing the automated collection arm with the joystick on each truck; (Tr. 373-374, 384-385, 400-401)

- Purchasing additional automated recycling trucks which can only be used in an automated fashion; (Tr.374, 401-402) and

- Purchasing approximately 20,000 96-gallon trash containers and approximately 20,000 64-gallon recycling containers for distribution to individual Lorain residents for use in conjunction with the automated collection service. (Tr. 366-368, 386, 388)

(Employer brief p. 10) These changes subsequently limited Lorain residents from unlimited trash and recycling to 96 gallons of trash and 64 gallons of recyclable materials each week. (Tr. 99-101, 103, 192-193, 368-371, 408; Union Ex. 4) "By limiting the maximum amount of trash and recycling [per residence], the Company was also able to limit the number of times a driver would potentially have to go to the landfill when completing his or her route." (Employer brief p. 10, fn. 12) "Additionally, by providing recycling containers, the number of residents recycling increased, and the amount of recycling increased from three (3) tons per day to fifteen (15) tons per day." (Employer brief p. 10; Tr. 59-60, 90-95, 193-195, 389, 405, 408)

Due to the automated collection service changes, the Company modified and increased the number of its routes and bargaining unit positions for Lorain based on the increased efficiency of automated collection. To accomplish this, the Company used its routing system, a local route auditor and a computer to determine the number and composition of the new routes. The original eight (8) total routes (seven manual trash routes and one manual recycling route) during its former manual operation increased to thirteen (13) total routes (four automated trash routes, three (3) automated recycling routes, four (4) once-monthly bulk waste routes and two (2) yard waste routes during

5

April to November. (Tr. 89-92, 103, 146-148, 191-192, 198-199, 399-400) The amount of recycling materials notably increased from three (3) tons per day to fifteen (15) tons per day. (Tr. 59-50, 90-95, 193-195, 389, 405, 408)

The Company reduced the piece work rates for the new automated routes in Lorain (Tr. 54, 75-76, 87-89, 105-106), acting in purported reliance on the language included in Article 9, Section 9.04 of the Agreement, which provides:

> The Company agrees to guarantee piece work rates for the term of this Agreement as long as service remains the same, such requirements including, but not limited to, the location of disposal sites, volumes generated per units, and equipment utilized to perform the service. A mere increase in house count shall not establish a change in service requirements, thereby justifying a reduction in the piece work rate. The Union reserves the right to grieve the adjusted rate.

The piece work rate, or incentive rate, is the amount of money a bargaining unit member earns for each house on his or her route. (Tr. 50-51, 303-304) That rate is paid based on the number of house that are on the route, rather than the number of houses that actually put out trash or recycling. (Tr. 129, 143-144, 303-304) "[P]iece work rates differ throughout the Company based on multiple factors, including, but not limited to, the type of collection (automated versus manual; front-load versus rear-load; the job with respect to the truck (driver versus helper; one man versus two men); the housing density (distance between houses, 'country' versus 'city;' dead ends/turnarounds on route); the distance (time) from the hauling company to the municipality; the distance (time) from the municipality to the landfill and what is being collected (trash versus recycling)." (Employer brief p. 13; Tr. 46-54, 57-60, 79-87, 160-161, 167-168) The Lorain piece work rate established by the Company for automated trash collection was set at $0.2207 per home and for automated recycling collection at $0.17 per home. (Union Ex. 4; Tr. 53-54)

Based on the significant changes to the individual routes resulting from the automation, which resulted in more than a twenty percent (20%) increase in house counts, the Company posted the new automated routes for bid. (Tr. 109-110, 125-133, 461, 339-340; Joint Ex. 1; Employer Exs. 7, 9) Thomas Coultrip ("Coultrip" or "Grievant"), the individual bargaining unit member identified in the Union's grievance (Joint Ex. 2) on behalf of the eight (8) original employees filing grievances, claimed his effective rate of pay was reduced for the work he performed on the new automated route he covered.

Because the instant grievance remained unresolved after its processing pursuant to Step 2 of the grievance procedure detailed in Article 7 of the Agreement, it was appealed by the Company to the Ohio Joint State Committee in Columbus. (Union Ex. 5) After that group rendered a unanimous decision upholding the Union's claim, the on-going dispute was then submitted to this arbitrator for final and binding resolution pursuant to Article 7, Section 7.03, Step 4.

## SUMMARY OF THE UNION'S POSITION

The Union notes that one of the major points of discussion during the negotiations for the current Agreement, which occurred in late January and early February of 2017, was the Company's on-going efforts to eliminate or amend Article 9, Section 9.04, cited above, which guaranteed that the piece work or incentive rate for the duration of the Agreement with the caveat that the service requirements remain the same. After the Union's repeated denial of several proposals made by the Company, the Agreement was ratified by both parties maintaining the same language in Section 9.04 that had existed in the expiring collective bargaining agree "guaranteeing the piece work rate (incentive rate) for the term

7

of the [A]greement with the same caveat that the service requirements remain the same."

(Union brief p. 4)

The Company notified the bargaining unit members to its intention to rebid all of the City's waste collection routes, pursuant to Section 10.07 of the Agreement.

> When the Company posted the routes for bidding purposes, the bargaining unit employees discovered that the incentive rate to be paid on the City of Lorain automated residential waste and recyclable collection routes was going to be less than the incentive rate paid to bargaining unit employees performing automated residential waste and recyclable collections services as other cities, townships and villages. Eight (8) grievances were filed protesting the lower incentive rate to be paid to the bargaining unit employees performing services on an automated residential waste collection route in the City of Lorain, including the grievance filed by [Coultrip].

(Union brief p. 5) The Union contends that the Company has unsuccessfully attempted to gain through arbitration what it could not obtain during negotiations for the current Agreement. The Union also notes:

> ... Article 9, Section 9.04 of the collective bargaining agreement is clear and unambiguous guaranteeing the piece work rates (incentive rates) for [its duration]. At the time the current {Agreement] became effective, the Company incentive rates were already established for all of the other automated residential waste collection contracts. According to the testimony of T. J. Rose, the Company's Operation Manager, the automated residential waste collection incentive rate for all other locations other than the City of Lorain was $.2307 cents per unit (house). For the City of Lorain, Mr. Rose testified that the incentive rate for the automated residential waste collection was $.2207 centers per unit (house). This same information was provided to the Union in its information request for presentation of its case to the Private Carriage Committee. (Union Ex. 4) The information provided by David Vosmer to Mark Schmiehausen, the Union's Business Representative, indicated that the City of Lorain automated residential waste collection incentive rate "went to $.2207 per home," while the incentive rates for "automated city routes outside the City of Lorain are at $.2307." (Union Ex. 4)

(Union brief p. 8)

The Union emphasizes that "the change in the volumes generated per units and the change in the equipment to perform the service was the same in the City of Lorain as it was

8

in every other location when the Company converted its collection method from a manual system to an automated system," and there is no difference in the type and manner in which the work is performed. (Union brief pp. 8, 9) Thus, the Union contends that there is no justification for the Lorain bargaining unit members not receiving the same incentive rate for doing the same work as the employees doing the same automated waste collection services as in the Employer's other service locations. The Union cites to specific employee impact resulting from the lower rate being paid to Lorain bargaining unit members:

> On Route 530 the bargaining unit employee awarded that route serviced 5,499 houses each week using the automated residential waste collection system for the City of Lorain. The difference in the incentive rate is $.01 cent per unit (house) resulting in a loss of income to that bargaining unit employee of $54.99 each week. Over a 52-week period, the annual loss to the bargaining unit employee awarded Route [530] is $2,859.48. The loss of income to the bargaining unit employee assigned to the recyclable Route 566 is even greater. (Employer Ex. 9) According to the Company's job posting, the recyclable route services 7,237 homes per week. A recyclable incentive rate established by the Company was $.1700 cents per house while all of the other locations the Company serves with an automated recyclable residential waste collection system receives incentive rate of $.2147 per house. That difference is $.0474 cents per house. The los[t] income for each week on Route 566 is $343.03 with an annual loss of income of $17,837.76.

(Union brief p. 9)

The Union insists that the Company's unsuccessful efforts to eliminate or modify Article 9, Section 9.04 of the Agreement should not permit its purported circumvention of the Agreement's provisions and that the Company should be required to make all affected employees whole for all lost wages resulting from the Company's alleged Agreement violation.

**SUMMARY OF THE EMPLOYER'S POSITION**

9

The Company's underlying argument is that the Union has failed to meet its burden of proving that the Company has, in fact, violated the Agreement. The Employer's underlying argument is that it was permitted to change the piece work rates for the new automated routes in Lorain based on the change in the service requirements for the automated collection. The Company contends:

> Under the plain language of Article 9.04, the Company is allowed to change piece work rtes anytime there is a change in the service requirements. On its face, the transition from manual collection to automated collection qualifies as a change in service requirements. Further, related changes to the equipment used (including retrofitting trucks for automated collection and purchasing new automated trucks) and to the amount of trash/recycling each Lorain resident could put out on a weekly basis that occurred in conjunction with the transition to automated collection constitute independent changes to "equipment utilized to perform the service" and "volumes generated per units" as examples of what constitutes a change in service requirement.
> Accordingly, the transition to automated collection . . . allowed the Company to change/reduce the piece work rates applicable to the new automated routes in Lorain. Although the CBA does not contain any minimum piece work rate or provide and methodology, formula or list of factors that must be considered when creating a piece work rate, the Company, in determining the automated piece work rates for Lorain, aimed to make its drivers whole. Specifically, despite having no obligation to do so, the Company sought to ensure drivers running the automated collection routes had comparable, if not greater, weekly compensation and effective hourly rates to when they were running more arduous manual collection in Lorain.

(Employer brief pp. 1-2)

In response to the Union's claim that the Company violated the Agreement by setting the piece work rates one cent lower for Lorain in comparison to other municipalities within the Company's automated collection services, the Company states that there is no Agreement requirement establishing that the Company utilize the piece work rate used in other municipalities for Lorain's rate. The Company avers: "In fact, the CBA does not set a minimum piece work rate, nor does it provide any methodology, formula or list of factors that must be considered when creating a piece work rate. Here,

10

the Company reverse engineered the piece work rate to ensure its drivers were made whole, and there is nothing in the CBA precluding the Company from setting rates in this manner." (Employer brief p. 3) The Company also notes that the Agreement does not include any guaranteed piece work rate (Tr. 197, 250-254, 297-298, 305-306, 429-430) nor any methodology or formula regarding what must be considered when establishing a piece work rate. (Tr. 263)

The Company cites to the following language in the "Management Rights" section, or Article 3 of the Agreement, as support for its purported right to adjust the piece work rate for the Lorain bargaining unit members: "Except as specifically modified by the express terms of the Agreement, all rights of management are retained by the Company, including, but not limited to the right: . . . to determine or introduce new, eliminate or change equipment, machinery, services or processes to make studies of workloads and to institute changes in the work loads and job assignments; to plan, direct and control operations; . . . to determine the job content and requirement of any job and the number of employees needed by the Company at any time." The Company emphasizes that Article 3 also concludes by stating that: "The above enumeration of rights is by way of example and is not a limitation on the Company's right to manage its enterprise and, except as provided in this Agreement, the right to continue or discontinue any past practice or benefit . . ."

The Company also notes that, when it negotiated the new contract to continue to provide waste collection services for the City after its initial December 31, 2013 through December 31, 2018 contract for an additional three (3) years, it would have been potentially competed via bidding with three (3) other area non-unionized companies. In this specific case, "with the guaranteed term of its initial contract with Lorain rapidly

11

approaching, the Company approached the City about a potential extension of the contract, which, for the time being, would avoid public bidding." (Employer brief p. 8; Tr. 360-366) The Company emphasizes that the automated collection identified in the new 2019 through 2021 Lorain contract required the Company to invest over $4 million. (Employer Ex. 10; Tr. 373-379, 390-395)

Based on that outcome, the Company notes:

> As a result of the change in the service requirements in the City of Lorain, the Company, consistent with Article 9.04 0f the CBA, adjusted the piece work rates for the new automated routes in Lorain and did so in a manner whereby its drivers received comparable (or greater) total compensation with comparable (or greater) effective hourly rates when compared to the prior manual operation in Lorain.

(Employer brief p. 11)

> In making these adjustments to the piece work rates, one of the Company's goals was to ensure that the bargaining unit members performing these new automated routes were made whole (i.e., that their daily/weekly compensation did not change as a result o the new piece work rates). (Tr. 56-57, 13-134, 438, 452-453) In order to do this, the Company reverse engineered the new piece work rate to ensure that daily/weekly compensation was not drastically different.

(Employer brief p. 13)

> To the extent the Union argues that using the piece work rate from other cities would have made the workers whole, there is nothing in the contract that required the Company to even strive to make the workers whole. Further, using the piece work rate for other cities would have more than make the workers whole. It would have resulted in a significant increase in pay. (Tr. 56-57) Such a windfall, however, is not required by the CBA, and, in fact, would be counterintuitive to significantly increase pay at the same time the job is made easier, more efficient and safer.

(Employer brief p. 13, fn. 15)

The Company asserts that it was successful in ensuring that the total route pay, as well as the effective hourly routes, were comparable to, if not greater than, the pre-automated amounts. (Tr. 133-144, 438, 452-453; Employer Ex. 8) " . . . [T]he average

daily compensation [for the automated trash collection services] was approximately $244.83 ($0.37.04 X 66 average houses per day manual collection) while the average daily compensation during automated trash collection is approximately $245.64 (average houses per day automated collection)." (Employer brief p. 15, fn. 17; Union Ex. 4) In referring to the language in Article 9, Section 9.04, which requires the Company to "guarantee piece work rates . . . as long as service requirements remain the same," the Employer suggests that the inverse principle embraced by that language is that the Company was permitted to change piece work rates when the service requirements changed with the automated services. "[T]his transition also resulted in a change in 'volumes generated per units' and 'equipment utilized to perform the service,' which are two of the non-exclusive example requirements expressly delineated in Article 9.04." (Employer brief p. 18)

In response to the underlying Union claim that the piece work rates for Lorain are $0.01 lower than the piece work rates used in other area municipalities with automated collection services provided by other Company employees, the Company maintains: (1) no language in the parties' Agreement requires the Company to use the same piece work rates from other municipalities for Lorain; (2) even if a past practice were deemed to exist, the Company exercised its "right to discontinue any past practice or benefit" by discontinuing the past practice and creating a new piece work rate for Lorain's automated route (Article 3 of the Agreement); and (3) "There is no violation of the CBA in setting a piece work rate for the automated routes in Lorain than is lower than the piece work rates in other automated municipalities, especially where, as here, the technology and software used to map routes and develop piece work rates is more sophisticated than it ever has been." (Employer brief pp. 22-23)

13

The Employer maintains that, despite the fact that no changes were made to Article 9, Section 9.04 of the Agreement when it was negotiated and ultimately ratified by both parties, the Employer has retained its ability to change piece work rates because there was a change in service requirements. Therefore, the Employer requests that the Union's grievance be denied.

## DISCUSSION

Here, there is really no dispute between the parties as to the facts and occurrences giving rise to the instant grievance and its arbitration. The basic disagreement in this matter is whether the evidence establishes a potential violation by the Employer of the parties' negotiated Agreement. Probably no function of the labor-management arbitrator is more important than that of interpreting the parties' negotiated documents. The majority of arbitration cases involve disputes regarding the rights under such agreements. In these cases, the negotiated document itself is the focus, and the function of the arbitrator is to interpret and apply its provisions.

In this arbitral proceeding, the burden of proof falls upon the Union, as the party challenging the Company's establishment of a new incentive rate for the Lorain bargaining unit members to establish by a preponderance of the evidence that a violation has, in fact, occurred.

> An established principle in labor arbitrations is that the party alleging a violation of a [negotiated] agreement bears the responsibility of proving by persuasive evidence that there has been a violation. There is no rigid formula stating the amount or degree of evidence that is necessary to sufficiently prove a contract violation. An arbitrator should evaluate all of the circumstances surrounding the alleged contract violation and weight the relative worth and

relevance of all of the evidence presented in relation to the terms of the collective bargaining agreement.

*Am. Std., Paintsville, Ky. and United Steelworkers of Am., Local 7916*, 05-2 Lab. Arb. Awards (CCH} P 3213 (Allen 2005.

An arbitrator's decision may not be based on competing equities or sympathies, but rather must be formulated on the basis of the language which the parties themselves have adopted to govern their on-going relationship. The arbitrator is a creature of the contract from which he derives his authority. He is limited thereby and must, therefore, confine his decision as directed or prescribed. Although he may use his expertise in interpreting and applying the negotiated provisions, the arbitrator may not substitute his own sense of equity and justice because his award must be grounded in the contractual terms, absent any inferences or intentions which are not apparent and not supported by words documenting any purported intent. It is the Agreement and its precise terms which must be examined to determine the merits of the dispute.

It is generally recognized that neither party should be able to gain through arbitration what it was unable to successfully assert in prior negotiations or bargaining. The law presumes that the parties each understood the import of Section 9.04 of the Agreement. "It is not for the arbitrator to question whether the parties made a good bargain." *Int'l Union of Operating Eng'rs, Local 3 and Premier Chems.*, 00-1 Lab. Arb. Awards (CCH) P 3245 (Calhoun 1999).

Based on a thorough review of the facts surrounding this dispute, the evidence submitted, and the arguments presented by the parties, the arbitrator here finds that the Union has successfully met its burden of establishing that the Employer has acted in violation of the Agreement's terms in determining or establishing a lower incentive or

piece work rate than that which was in effect prior to the activation of the new Agreement without establishing that that was a recognized component resulting from the parties' negotiations.

Although the Company was unsuccessful in amending or eliminating the language in Article 9, Section 9.04 which had been part of multiple prior versions of the parties' collective bargaining agreements, it acted independently in establishing a lower incentive or piece work rate than that which was the on-going and recognized rate earned by other bargaining unit members working in other municipalities or geographic areas in that region serviced by the Company and doing the same job functions. "When a party fails to negotiate in good faith, the collective bargaining process becomes an exercise in unfulfilled expectations and meaningless unenforceable promises . . . [T]he idea of good faith bargaining goes to the very heart of labor-management relations." *Hinsdale High School Teachers' Ass'n, IEA-NEA and Hinsdale Township High School Dist. 86 Bd. of Educ.*, 09-2 Lab. Arb. Awards (CCH) P 4706 (Goldstein 2009).

The duty to bargain in good faith is a mandatory duty. Adopting the standard from the federal statute, the National Labor Relations Act, 29 U.S.C. § 158(d), good faith bargaining has been defined as: "the performance of the mutual obligation of the employer and the representative of the employees to confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising there under." *Firefighters, Local 2298 and City of Ada, Okla.*, 99-2 Lab. Arb. Awards (CCH) P 3008 (Eisenmenger 1999). The Employer made a series of proposals regarding Article 9, Section 9.04, first to eliminate it, then to modify it conditionally based upon new or renewed municipal contracts, and finally to freeze "red

circle" the driver's incentive rate. Yet, there was no evidence that a reduction below the automated rate paid to drivers doing the same work with similar equipment for the Company in nearby cities was proposed or discussed, even though the Employer entered into the bargaining process with the Union knowing the change to an automated system would impact the economics of the service contract entered into months earlier with the City of Lorain. The evidence and testimony indicates that during negotiations both parties were well aware of the move from manual trash and recycle pick-up to automated pick-up and what this entails, having experienced it multiple times in nearby communities, and they were also aware given their familiarization in going from manual to automated trash and recycle pick-up that all other locations, paid a waste incentive of $.2307 cents per hour to drivers. The Employer insists that when it put into place a waste incentive rate of $.2207, (or below that paid to all other locations serviced by the Company under an automated system) it reverse engineered an incentive system that was designed *"...to ensure that the drivers were made whole..."* (Company Brief, p. 23) The Union asserts that the change in volume generated per unit and the change in equipment utilized to perform automated pick-up are the same type of changes that were known to the parties anytime manual residential waste and recyclable collections was converted to automated waste collection and that rate at the time of negotiations over Article 9, Section 9.04 of the Agreement was according to the Company's operation manager, T. J. Rose, $.2307 cents per unit. The Union, without any knowledge that the Company was contemplating a lower rate of $.2207 per unit and informed by the language of 9.04 remaining the same after numerous attempts by the Company to eliminate or modify it, reasonably assumed that the established incentive rate for all other bargaining unit members in other union bargaining

units in nearby communities for the Company would be applicable for the Lorain employees carrying out the same duties with the same type of equipment. In stark contrast to the Company's insistence that drivers were in essence made whole regarding the waste incentive rate through its reverse engineering of the automated driver in Lorain insists that drivers are losing substantial sums of money on an annual basis. (Union Brief, p. 9)

Although the decision of the Ohio Joint State Committee is not controlling in this matter at this level, this arbitrator gives deference to its October 17, 2017 Unanimous decision (as opposed to a Decision Majority), which was sought by the Company and preceded this arbitration. (Union Ex. 5) The members of that committee are likely very familiar with the dynamics of the trash disposal business and the workings and significance of incentive rates paid for such work. The Union in this case held the rational assumption, particularly based upon evidence of bargaining proposals made and rejected in negotiations and eventually abandoned by the Company in favor of maintaining current language, that the incentive rate under automated trash and recycle collection in Lorain would remain the same as other workers in surrounding communities who were doing the same work. While there was a proposal by the Company to freeze wages/incentive/piece rates for automated drivers, there was no agreement to establish a lower rate for the Lorain bargaining unit members and no language change was made in Article 9.04 of the Agreement. (See Union Ex. 6)

**AWARD**

The Union's grievance is sustained.

The parties are first directed to meet within at least thirty (30) days from the date of this decision to first correct and pay the driver incentive rate retroactively back to the filing date of the grievance (May 4, 2017) for each affected Lorain bargaining unit member who filed a grievance, earned the lower incentive rate since the grievance filing date of May 4, 2017, and who is still actively employed by the Company.

Secondly on a prospective basis (date to be determined by the Company) the Company shall meet with the Union and shall reengineer the automated waste and recycle incentive rates and route bids, if necessary, for the remainder of the Agreement that makes drivers whole consistent with the requirements of Article 9, Section 9.04, which may include automated driver waste and recyclable incentive rates consistent with other comparable nearby jurisdictions of the Company and the Union or any other approach acceptable to the parties.

This arbitrator will retain jurisdiction for ninety (90) days or longer, as determined by the arbitrator, in order to enable proper resolution of this matter.

Pursuant to Section 7.06 of the Agreement, the arbitrator's fees and expenses shall be paid equally by the parties.

Respectfully submitted to the parties this ____ day of May 2019,

**Robert G. Stein, Arbitrator**

**AWARD**

The Union's grievance is sustained.

The parties are first directed to meet within at least thirty (30) days from the date of this decision to first correct and pay the driver incentive rate retroactively back to the filing date of the grievance (May 4, 2017) for each affected Lorain bargaining unit member who filed a grievance, earned the lower incentive rate since the grievance filing date of May 4, 2017, and who is still actively employed by the Company.

Secondly on a prospective basis (date to be determined by the Company) the Company shall meet with the Union and shall reengineer the automated waste and recycle incentive rates and route bids, if necessary, for the remainder of the Agreement that makes drivers whole consistent with the requirements of Article 9, Section 9.04, which may include automated driver waste and recyclable incentive rates consistent with other comparable nearby jurisdictions of the Company and the Union or any other approach acceptable to the parties.

This arbitrator will retain jurisdiction for ninety (90) days or longer, as determined by the arbitrator, in order to enable proper resolution of this matter.

Pursuant to Section 7.06 of the Agreement, the arbitrator's fees and expenses shall be paid equally by the parties.

Respectfully submitted to the parties this 22nd day of May 2019,

**Robert G. Stein, Arbitrator**

19